FC1LCANC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ERIC CANTONA, et al.,

4                    Plaintiffs,

5              v.                              15 CV 3852 (RA)

6    NEW YORK COSMOS, LLC,

7                    Defendant.

8    ------------------------------x
                                              New York, N.Y.
9                                             December 1, 2015
                                              2:10 p.m.
10
     Before:
11
                         HON. RONNIE ABRAMS,
12
                                              District Judge
13
                            APPEARANCES
14
     LAW OFFICE OF CORDERO, RICHARDSON, COMPO & ASSOCIATES
15        Attorneys for Plaintiff
     BY:  MICHAEL C. COMPO
16
     GORDON & REES LLP
17        Attorneys for Defendant
     BY:  BRIAN E. MIDDLEBROOK
18        -and-
     DORSEY & WHITNEY LLP
19   BY:  WILLIAM G. PRIMPS

20

21

22

23

24

25

FC1LCANC

1          (Case called)

2          THE COURT:  Good afternoon.  So we're here to discuss

3     defendant's motion to dismiss and plaintiffs' motion to strike.

4     I have a sense of where I'm going to come out, but I'm happy to

5     hear anything you'd like to add to your briefs today.

6          I think I'll hear from defendants first since it's

7     your motion.

8          MR. MIDDLEBROOK:  Thank you, your Honor.  I think it's

9     worth starting with a very brief history of the two entities

10    involved here.

11         THE COURT:  Sure.  Just speak into the microphone.

12    Thank you.

13         MR. MIDDLEBROOK:  The New York Cosmos is one of the

14    most storied professional soccer teams in history with the

15    likes of Pele playing for them in the seventies and eighties.

16    In the mid-1980s, the professional league that they were

17    affiliated with disbanded and the team ceased playing up until

18    around 2010 when new management took place.

19         Under new management, the contract negotiations began

20    with Mr. Cantona, the plaintiff in this matter.  The idea here

21    for the New York Cosmos was to affiliate themselves under this

22    basically an appearance contract with Mr. Cantona in developing

23    and redeveloping and reestablishing the New York Cosmos as a

24    professional soccer team.

25         Mr. Cantona is probably one the best soccer players in

3

FC1LCANC

```
1    history.  That being said, he comes with what I believe

2    plaintiff admitted to being a colorful past.  There were

3    several incidents.  One that primarily comes to mind that was

4    footnoted in the defendant's motion is the kung fu kick.  This

5    idea of having a colorful past and Mr. Cantona's potential for

6    such conduct was of paramount importance in the drafting of

7    this consulting agreement.  That was one of the primary reasons

8    for the inclusion of a morals clause which left to the Cosmos'

9    discretion if in their reasonable opinion Mr. Cantona's conduct

10   brought the Cosmos, their brand, or Mr. Cantona into material

11   disrepute.

12          With that history in mind, it's of utmost importance

13   to bring to the Court's attention that what I think plaintiff

14   repeatedly clouds the issues with and that is this reference to

15   a failure to timely make payments.

16          THE COURT:  Why is that clouding the issue?

17          MR. MIDDLEBROOK:  Because those issues, when they

18   occurred -- and the issue was brought to the Cosmos' attention

19   by letters on January 14 of 2014 and February 14 of 2014.  In

20   those letters they specifically stated, that is, Cantona's

21   representatives, that they wish to discuss his role with the

22   club and that they were making a request for payments.  At no

23   time was this agreement terminated due to a breach.  There was

24   no termination.

25          Under the election of remedies doctrine and a long
```

FC1LCANC

1   line of cases, but primary *ESPN v. Office of Commissioner*,

2   which plaintiff similarly relies upon, once the remedy is

3   elected, and then in that instance the remedy was to continue

4   performance with the option to later sue for a breach limited

5   to the breaches brought to the Cosmos's attention, untimely

6   payments primarily --

7          THE COURT:  Why is it clear that he elected that

8   remedy?

9          MR. MIDDLEBROOK:  Because at no time did he terminate

10  the agreement.  And the agreement was very specific in how it

11  would be terminated.  There would have had to have been notice,

12  an opportunity to cure.  Mr. Cantona would have had to provide

13  a release.

14         THE COURT:  But even if he didn't terminate the

15  agreement, why isn't there at least a question of fact as to

16  whether as of March of 2014, the Cosmos's failure to pay him

17  for more than six months constituted a material breach that

18  would excuse his obligation under the morals clause or just

19  pursuant to contract law?

20         MR. MIDDLEBROOK:  Several reasons.

21         One, the obligation per the terms of the contract were

22  to put the Cosmos on notice within 30 days of the alleged

23  breach.  He failed to do that.

24         No. 2, if it was his position that the Cosmos were in

25  breach and he intended to terminate, the agreement required for

FC1LCANC

1    him to terminate the agreement in accordance with its terms.

2              Three, at the point that Mr. Cantona was terminated

3    due to a breach of the morals clause, full payment up to the

4    termination date, and that is a defined term in the contract,

5    was made, approximately $450,000.  Any alleged damages arising

6    from these purported breaches would have been satisfied and

7    were satisfied with that payment.

8              So the Court is really only left with a determination

9    of whether the termination under the morals clause was

10   appropriate and that is essentially admitted in the complaint.

11   Paragraph 28 of the complaint specifically acknowledges receipt

12   of full payment up to the termination date.

13             THE COURT:  Right.  But, first of all, he was paid

14   afterwards, right?  There was at least a six-month period where

15   he wasn't paid, correct?

16             MR. MIDDLEBROOK:  In that six months, he opted to

17   continue performance under the terms of the agreement.  The

18   agreement didn't cease to exist merely because a lawyer letter

19   was sent to the Cosmos saying, hey, I want to discuss your role

20   and I want to discuss these payments that were due.  The letter

21   in February 2014 also says that this needs to be addressed

22   within the next 15 days.  Then there was complete silence up

23   until Mr. Cantona punched an individual in the face outside of

24   a London pub on March 12 of 2014.

25             The parties were still performing under the terms of

FC1LCANC

1    the contract at the time Mr. Cantona was admittedly involved in

2    an altercation outside of that pub.  The only relevant question

3    is was the Cosmos's decision to terminate him under the morals

4    clause appropriate.  And the answer, particularly under *Nader*

5    and per the instructions of the Second Circuit, is a resounding

6    yes, it was appropriate.  *Nader* specifically says the

7    undisputed facts that Nader was arrested and that the arrest

8    generated media attention brings his conduct well within any

9    reasonable interpretation of the morals clause.

10            THE COURT:  But aren't you conflating the ability to

11   terminate with the obligation to provide notice?  Show me, for

12   example, a provision in the contract or which provision that

13   requires Cantona to give notice of a breach by the Cosmos, as

14   opposed to how a party can terminate if it wants to terminate.

15   You're going to show me the termination, right, the section on

16   termination?

17            MR. MIDDLEBROOK:  Right.

18            THE COURT:  Okay.

19            MR. MIDDLEBROOK:  Under Section 8.4, particularly 8.4.

20            THE COURT:  8.4.1, right, talks about in the event

21   Mr. Cantona wishes to terminate this agreement.

22            MR. MIDDLEBROOK:  8.4.2 specifically says

23   Mr. Cantona -- and I'm cutting to the middle of the sentence; I

24   can read it in its entirety -- Mr. Cantona gives New York

25   Cosmos prior written notice of such event or condition within

FC1LCANC

1    30 days of the occurrence of the event or other condition which

2    would otherwise constitute good reason and such event or

3    condition is not corrected by the New York Cosmos within 30

4    days notice.

5             MR. COMPO:  8.3 is what you want to look at, Judge.

6             THE COURT:  Just let me go back for a second.  You

7    concede then, as I understand you, that the Cosmos's failure to

8    pay him for the six-month period constituted a breach of the

9    agreement on their part; is that right?

10             MR. MIDDLEBROOK:  It was potentially a breach, but it

11   was Cantona's obligation to notify of that breach.  And if you

12   read the letters that were sent in January and February 2014,

13   they wish to discuss it and presumably were providing the

14   Cosmos with an opportunity to remedy that situation, which is

15   why the letter exclusively discussed how we can quote/unquote

16   respect the agreement.  There was never a discussion or a

17   statement by Cantona or his representatives that they wished to

18   terminate the agreement and they did not.  The agreement was

19   still in full force and effect at the time of Mr. Cantona's

20   incident.

21             THE COURT:  Isn't there a difference between providing

22   notice if you seek to terminate as opposed to preserving a

23   breach?

24             MR. MIDDLEBROOK:  No, your Honor.  The issue as

25   identified as black letter law in the *ESPN* case is that once

FC1LCANC

1    the nonbreaching party elects its remedy, it is bound by that

2    election.  It cannot later sue for breach, for the purported

3    breach that it did not terminate the contract for.

4            THE COURT:  So again let's go back to the election of

5    remedies.  Your position is that he elected that remedy in the

6    letters from the French attorney, that that was the election,

7    or by just simply by failing to terminate, he elected his

8    remedy; is that your position?

9            MR. MIDDLEBROOK:  That there are only two options --

10    termination or continued performance.  The notices sent by

11    Cantona did not terminate the agreement.  They contemplate and

12    specifically said they were continuing performance.  It was an

13    explicit representation of the election.  There was nothing

14    vague about the letter sent in February of 2014.  It was

15    attached to plaintiffs' complaint.  They wish to confer on his

16    roles and his duties, and they wish to address the outstanding

17    payments.

18            Just by virtue of wishing to discuss his continued

19    role with the club, one can derive their intention to continue

20    performing.  That's a distinctly different position than as a

21    result of your failure to pay, this agreement is terminated.

22    So we're left with a situation where the parties were obligated

23    to continue performance in accordance with the terms of the

24    agreement.

25            THE COURT:  Right.  And the Cosmos were in breach, the

1    Cosmos were in breach because they hadn't paid him, right, for

2    six months; isn't that your position?  You've got to decide one

3    way or the other.  Either they were in breach and he didn't

4    terminate in spite of that breach.  That's your position, as I

5    understand it.

6            MR. MIDDLEBROOK:  And what I'm saying is that the

7    issue with Cantona's election is clear.  The fact that any

8    notice was sent after the 30-day requirement imposed by the

9    agreement calls into question whether or not the notice of that

10   breach was successfully performed.  If you are to operate under

11   the assumption that the notice was appropriate and that there

12   was a failure to pay, then the Cosmos breached at that moment.

13   But this idea that there was a continuing breach I can't

14   necessarily agree with.

15           The point is that the parties were obligated to

16   continue performing and at the moment that Mr. Cantona was

17   involved in the confrontation outside of a London pub, he was

18   in breach of the morals clause.

19           The key factor to consider, your Honor, and that's why

20   I started with the history of these entities, Cantona's

21   behavior was of paramount importance.  He entered into a

22   consulting agreement for the purpose of serving as the face of

23   this professional team looking to get back into the world of

24   professional soccer.  He then got into a physical altercation

25   with an individual outside of a pub with an unknown female and

FC1LCANC

1     was issued a warning, of sorts, after being arrested.

2              Now, plaintiff takes issue with the use of the term

3     arrest.  You know, Mr. Cantona was taken into custody and by

4     definition under New York law was arrested.  This happened in

5     London.  So whatever semantics plaintiff is engaging in, it's

6     irrelevant and, frankly, the arrest per se is irrelevant.  The

7     uncontested fact and what is acknowledged by Cantona is that he

8     was involved in an altercation.

9              It is in accordance with *Nader* an issue of law for

10    this Court to decide and one that is absolutely fact that once

11    he was involved in this altercation, the Cosmos had every right

12    to terminate him for bringing their brand and their company

13    into material disrepute.

14             The publications that are the source of a motion to

15    strike and, again, as I'm sure we'll get into, they were not

16    presented to the Court for purposes of the truth of their

17    substance.  It was merely to bring to the Court's attention the

18    fact and the request that the Court take judicial notice of the

19    fact that this occurrence was publicized across the globe,

20    often in conjunction with the New York Cosmos and Mr. Cantona's

21    role as director of soccer.

22             Under *Nader* and the cases defendant relies upon, they

23    had the discretionary authority to terminate the agreement at

24    that time.  They made payment for all amounts due up to the

25    date of termination, rendering moot any issue with respect to

FC1LCANC

1    unpaid amounts due; and the contract was terminated.

2             THE COURT:  What about the time period between when

3    the French counsel sent the second letter to the Cosmos

4    requesting that the team clarify its intention and the

5    incident?  It's about a month.  And, as alleged, and we're

6    assuming the facts in the complaint as alleged to be true, that

7    during that approximate one-month period, the Cosmos continued

8    to breach their obligation under the agreement because the

9    failure to pay was continuous.  Am I right about that?

10            MR. MIDDLEBROOK:  No, in that this idea of a

11   continuing breach is -- I'll go back to the *ESPN* case and what

12   the law states.  The plaintiff, the obligation was on Cantona

13   to put the defendant on notice of a breach.  Once Cantona did

14   so, if that is how the February letter is construed, his

15   options with respect to his remedy for pursuing that breach

16   were limited to a lawsuit for the damages specifically

17   resulting from the breach.  He could no longer terminate the

18   agreement based upon that alleged breach of, in this instance,

19   nonpayment.

20            THE COURT:  So you're saying that if after that letter

21   was sent, the Cosmos continued for a year or two years or

22   numerous years not to pay him, that at no time could he say

23   that they had breached the agreement; is that your position?

24            MR. MIDDLEBROOK:  No.  My position is if there came a

25   point in time where the Cosmos breached the agreement and

FC1LCANC

1    Cantona put them on notice of his intention to terminate the

2    agreement for that breach, then at that point per the agreement

3    Cantona was obligated to provide the notice, the opportunity to

4    cure, a release that was satisfactory to the Cosmos, which

5    would result in approximately 55-day potential span of time for

6    the parties to continue addressing the issue.

7          There was a very specific and defined set of

8    occurrences in the event that Cantona identified a breach and

9    sought to terminate the agreement.  None of those occurred and,

10   in fact, there was a specific intention to continue performing.

11         So what's being conflated here is this idea that

12   plaintiff, that Mr. Cantona somehow was permitted to act in any

13   way he saw fit because of notice provided to the Cosmos of a

14   failure to make a payment.  That is an entirely incorrect

15   reading of the *ESPN* case and black letter law on the election

16   of remedies.

17         He made a choice -- continue performing under the

18   terms of the agreement.  It doesn't matter at that point what

19   the Cosmos did.  He determined how he would proceed with

20   respect to the Cosmos's actions and performance under the

21   agreement.  Once he opted to do so, he had to continue acting

22   in accordance with the terms of that agreement.  And once he

23   was involved in an altercation which he admitted to being

24   engaged in, he was in breach of that agreement, a breach which

25   could not be cured under the terms of the morals clause.

FC1LCANC

1          THE COURT:  Okay.  All right.  Thank you.  I'm happy

2      to hear you out if there's additional arguments you'd like to

3      make.

4          MR. MIDDLEBROOK:  The arguments with respect to each

5      of the remaining claims, they're fully detailed in the motion

6      papers, your Honor.

7          THE COURT:  Yes, and I've reviewed them.

8          MR. MIDDLEBROOK:  Okay.  I mean I think it's worth

9      noting with respect to the claim for breach of implied covenant

10     of good faith and fair dealing, the claim for unjust

11     enrichment, those are entirely duplicative of the breach of

12     contract claims.  There's also extensive case law, *RJ Capital

13     v. Lexington Capital*, *Beth Israel Medical Center v. Horizon

14     Blue Cross and Blue Shield*, as well as many other cases the

15     defendant relies on, establishing where there is a contract

16     between the parties, these theories and quasi-contract based on

17     the same set of facts and resulting from the same alleged

18     damages cannot stand.

19          Similarly, with respect to the third party beneficiary

20     claims, the case law is very clear.  For example, *Fourth Ocean

21     Putnam Corporation v. Interstate Wrecking Company*, the

22     third-party beneficiaries have no right to enforce a contract

23     where there is an intended beneficiary who does benefit from

24     the contract and in this case that is Cantona.

25          THE COURT:  Weren't they also intended beneficiaries?

FC1LCANC

1      MR. MIDDLEBROOK:  They were intended third party

2  beneficiaries.  That's a distinctly different notion from the

3  ability to enforce the contract.  And the case law is clear

4  that where you are a third-party beneficiary, if the contract

5  does not explicitly grant you that right, which this contract

6  does not, then the only way that a third party beneficiary has

7  standing to bring a claim for breach is if there's no other

8  entity that benefits from the contract.  In this case, clearly,

9  Mr. Cantona stood to collect almost $4 million in accordance

10  with its terms.

11      Finally, your Honor, with respect to the labor law

12  cases, the Labor Law Article 6 claims, the defendant is moving

13  to dismiss those claims in their entirety as well.

14  Mr. Cantona, the third-party beneficiaries, they were not

15  employees under the contract.

16      THE COURT:  Isn't that a factual decision, a

17  determination that needs to be made when there's a factual

18  record in this case whether he was an employee?

19      MR. MIDDLEBROOK:  Under *Bynog v. Cipriani Group*, those

20  are issues of law as well.

21      It's also critical to note, your Honor, that even if

22  Mr. Cantona was deemed to be an employee, he would be deemed to

23  be at the executive level for which Section 193 doesn't apply.

24  And that also presumes that at some point in the complaint,

25  Cantona specifies what specific claims he's making, which he

FC1LCANC

1    does not.  And in his opposition he relies upon the definition

2    section of Article 6 of the Labor Law.

3         And finally, your Honor, I would just say with respect

4    to the motion to strike, we already touched upon it, but the

5    articles that were presented and attached were presented

6    exclusively seeking that the Court take judicial notice of the

7    fact that they were publicized.  This is not a situation

8    where -- and the case law cited by plaintiff exclusively

9    contemplates situations where the actual substance of the

10   publications is being relied upon.

11        Here, it is strictly for the existence of this claim

12   on a global scale and the implications of Mr. Cantona's conduct

13   as it impacted the Cosmos's brand.  And they were within their

14   rights to terminate Mr. Cantona.  And it's important to note

15   that the agreement specifically contemplated and used the term,

16   if within the Cosmos's reasonable opinion, Cantona's conduct

17   brought the Cosmos or their brand into material disrepute, he

18   could be terminated.

19        THE COURT:  Isn't that a factual question too?

20        MR. MIDDLEBROOK:  Not at all, your Honor, and that's

21   why their reliance on *Nader* and the line of cases from the

22   Second Circuit is of critical importance.  These are issues of

23   law.  *Nader* was determined at the summary judgment stage simply

24   because parties didn't file a motion to dismiss.  But the Court

25   was explicitly clear that it is an issue of law and that the

FC1LCANC

1    undisputed fact that the individual was arrested and that the

2    arrest generated media attention brings his conduct well within

3    any reasonable interpretation of the morals clause.

4              THE COURT:  Thank you very much.

5              MR. MIDDLEBROOK:  Thank you.

6              THE COURT:  Would you like to be heard?

7              MR. COMPO:  I would, your Honor, I would.

8              Judge, 12(b)(6) motions, they accept the factual

9    allegations set forth in the complaint as true and draw all

10   reasonable inferences.  Although well argued, I believe all the

11   issues are for summary judgment here.  And it's important to

12   note that there are significant factual allegations in the

13   complaint that are also re-alleged in the causes of action.

14   Specifically, also, there is allegations that there were two

15   notices.  There is one notice attached to the complaint and

16   there is another that still has to be proven and also what the

17   contents of that notice was.

18             This idea of election of remedies, I feel the Court

19   was pushing towards this idea that there is a cutoff and there

20   is a point where, hey, there's got to be a clear election here

21   and not just a good faith duty to try to negotiate terms

22   because this is exactly what it was.  This was Mr. Cantona

23   reaching out and trying to renegotiate or negotiate an

24   understanding of the contract.

25             It doesn't mean that he waived his election.  In fact,

FC1LCANC

1  the doctrine of election of remedies typically only applies

2  when the nonbreaching party continued to receive benefits under

3  the contract.  If you read the allegations along with the

4  exhibits of the complaint, what it says is that not only was he

5  deprived of his payment, which is material breach under the

6  agreement and under the law, but he was also replaced as

7  director.

8          So it's unclear what benefit Mr. Cantona had at this

9  point.  He wasn't getting paid.  He didn't have the position

10  that he was given under the contract.  And there was no

11  response by Cosmos at all.  So how could, under their argument,

12  how could Mr. Cantona presumably give them a release that they

13  were comfortable with if they weren't communicating with him.

14          And, Judge, I would like for you to read the contract

15  because there needs to be an understanding of this termination

16  clause which I'm surprised hasn't been brought up before.  But

17  there is a termination clause which starts at eight and it

18  starts at 8.1, 8.11, 8.12, which are not applicable here.  And

19  then there's 8.13 which says, the termination of this agreement

20  by New York Cosmos for cause.  Okay, so we have that.  And then

21  we move to 2 which also alleges specifically conduct which in

22  the reasonable opinion of New York Cosmos brings Mr. Cantona,

23  the New York Cosmos, or any subsidiary or affiliate or its

24  brand into material disrepute.

25          Now, this is a question of reasonableness and they

FC1LCANC

1    have it in there.  It says, in the reasonable opinion of New

2    York Cosmos.  What does that mean?  Does that mean if

3    Mr. Cantona got a parking ticket he would fall under the

4    reasonable opinion of New York Cosmos material disrepute?

5           You have to look at *Nader* in the context of how it was

6    decided.  *Nader*, ABC actually did not take action against Nader

7    for his first arrest, which was drunken driving and resisting

8    arrest.  There was no action on that.  So clearly there's a

9    level at which a party may not take action and it may not be

10   reasonable.  I don't know what that is, but it certainly is a

11   question of fact.  Later, Nader got a second shot at it and he

12   failed miserably.  He got arrested for cocaine distribution,

13   which is a felony under that specific contract.

14          Now, if you go back to *Mendenhall*, which is a case

15   that I cited in my brief, and you look at *Mendenhall*, it was a

16   North Carolina federal court was applying New York law.  And it

17   said in *Mendenhall* that, you know, there is an obligation

18   underlying the contract to act in good faith and fair dealing.

19   This means that a party to the contract can't act irrationally

20   or unreasonably.  And they went on to deny judgment on the

21   pleadings because of that specific language.

22          Now, counsel points out that this was an idea where

23   *Mendenhall* just basically made tweets out on the internet.

24   Well, we're dealing with and what counsel puts forth in their

25   affidavits as four internet articles that were put out on the

FC1LCANC

1  internet.  Now, we have to look at that in the context of

2  what's being put out there.  We're in a different world here,

3  your Honor.  We're in a world where anything can be put out on

4  the internet and whether it's true or not, it's out there.  So

5  there's an inquiry here.  In this era of internet era, is this

6  something that rises to the level that is material disrepute

7  and whether the Cosmos acted unreasonably by terminating

8  Mr. Cantona.

9        Now, let's look at the context in which all this

10  happens.  He hasn't gotten paid for six months.  He filed one

11  notice, no response.  Filed another notice, no response.  He

12  gets taken out as the director of soccer organization, which is

13  in the letter and the Court can take that into consideration

14  because it's attached as an exhibit.  So all these, although

15  counsel says they're irrelevant, they're actually very relevant

16  because my client alleges pretext, pretext in that not just a

17  conclusion of law, but we go on to explain that they didn't

18  want to pay him the 4 percent equity interest in the Cosmos.

19  Now, that's an issue of fact that we have to discover because

20  looking at all this conduct in its context raises not only one

21  eyebrow but two.

22        And, Judge, just for the termination issue, 8.3, which

23  is what they rely on, specifically states the New York Cosmos

24  may additionally terminate this agreement on not less than 30

25  days written notice of termination to Mr. Cantona, the New York

FC1LCANC

1    Cosmos.  Reading this in its entirety, upon such termination,

2    reverting back to that first sentence, termination, referring

3    to the termination in the first sentence, or any termination of

4    this agreement by Mr. Cantona for good reason defined below,

5    and the receipt of New York Cosmos general release form in

6    substance reasonably satisfactory -- and again, your Honor, we

7    did plead that all conditions have been met, have been waived

8    or have occurred -- that becomes effective and irrevocable no

9    later than 55 days following the termination date the New York

10   Cosmos shall make and there's the remedy there.

11           But, Judge, we're reading this in context here it says

12   the New York Cosmos may additionally terminate this agreement

13   on not less than 30 days written notice, not Mr. Cantona.  So

14   we go back to that letter we read it in context.  On

15   January 14, I wrote you about my client's worries regarding the

16   nonrespected consulting agreement.  It seems I haven't had an

17   answer.  Furthermore, my client let me know that the payments

18   for January haven't been made.  So they haven't paid September.

19   They're informing them of another breach for January.  And such

20   a situation is not acceptable and with no delay, clarify your

21   intentions concerning the role.  Your intentions, what are your

22   intentions?  Are you going to terminate this agreement?  What

23   are you doing?  I believe these are issues of material fact,

24   your Honor.

25           In fact, concerning Eric's visa, could you please

FC1LCANC

1    confirm that the club as an employer took necessary steps to

2    obtain on time its renewal.  So now they're concerned about

3    another thing that's under the contract, a visa.

4            THE COURT:  Let's just talk about defendant's argument

5    regarding election of remedies for a minute.  In your view, at

6    what point did Mr. Cantona elect his remedy for the Cosmos'

7    breach?  Did he do it in February 14 in the letter where he

8    held back on termination?  Did he do it at some point between

9    February 14 and March 12?  Did he do it on March 12, or did he

10   do it when he filed this lawsuit?

11           MR. COMPO:  Well, your Honor, it's our position that

12   Mr. Cantona performed to the agreement up until the first

13   notice was sent.  And at that point when he discovered --

14           THE COURT:  I'm sorry, when you say notice, are you

15   referring to --

16           MR. COMPO:  The January.

17           THE COURT:  -- the letter from his attorney.

18           MR. COMPO:  Yes, the letter that references the

19   January 14 letter.  That was notice of their nonpayment.  And

20   again, your Honor, I cited *Hallinan* at 519 F.Supp.2d at 352

21   where a court finds that a breach claim is barred by the

22   doctrine of elections of remedies, the claimant has not only

23   continued to perform under the contract, but receives a benefit

24   under the contract.  The doctrine of election of remedies only

25   applies when the nonbreaching party continues to receive a

1    benefit under the contract.

2              So the question is and I think it's really what were

3    the intentions of the parties when all this was going on.  I

4    think the termination clause is unclear because we have a

5    beginning sentence that says the New York Cosmos may

6    additionally terminate this agreement on not less than 30 days

7    notice.

8              Does the fact that Mr. Cantona doesn't send the notice

9    within 30 days, does he basically waive his breach of contract?

10   I don't think that's black letter law, your Honor.  I think

11   when there's a nonpayment under a contract, which is the

12   benefit you're receiving, you're really receiving the monetary

13   benefit of a contract and the designation as a director, and

14   when all that is taken away and you're not receiving any

15   benefit, are you really, because you didn't give that 30 days

16   notice, but you did in fact give notice, are you waiving that

17   breach of contract?  I just don't see it, your Honor.

18             I see there are several questions that need to be

19   answered here.  I think they're all issues of material fact.  I

20   think you have to look at the reasonableness, the underlying

21   motivation behind all this.  And I think what will come to

22   light is that they did not want to pay him his 4 percent equity

23   interest.  And when the inquiry began into that 4 percent

24   equity interest, that's when all benefits ceased to be given to

25   Mr. Cantona.

FC1LCANC

1      And it's interesting to note that the incident that

2  occurred -- and there is a factual dispute as to what occurred

3  in London.  And we allege that it did occur in London and there

4  are different laws in London than there are in New York.  In

5  fact, paparazzi have to stay back a certain distance from

6  people that are in the public realm.

7      THE COURT:  Does it matter whether the articles were

8  true or not?  Can't an article create a negative impression to

9  the public even if they're not true?

10      MR. COMPO:  Well, to the public, what negative

11  impression and what was published?  We have four articles here

12  that were online that our arguments are that this is not

13  something that should be taken judicial notice of.

14      THE COURT:  Can't I take judicial notice of the fact

15  that they were published as opposed to the truth of the

16  contents of the articles?

17      MR. COMPO:  Well, you can, if it's a reliable source.

18  And courts have done that, but it was limited circumstances.

19  It's when there was undisputed facts.  And something like the

20  stock market crash, they took a publication of a well-known

21  newspaper and the court took judicial notice of that.  We're

22  talking about internet articles that are I don't know who

23  they're from.  I've never heard of the Guardian.  But

24  apparently these were published.  And, Judge, if these come in,

25  why not allow us to come in and show what was published later,

FC1LCANC

1    how this really doesn't affect anything.

2             They talk about this kung fu kick as though it

3    happened yesterday.  This was 25 years ago.  And in this

4    25-year span, as counsel said, Mr. Cantona is one of the best

5    soccer players to ever live.

6             THE COURT:  I think counsel just mentioned that as

7    background regarding why there was a morals clause in the

8    contract to begin with.  That's how I understood his argument.

9    But in any event.

10            MR. COMPO:  If you look at the contract, there is an

11   opportunity to cure a violation of the morals clause.  It's in

12   the contract and it says --

13            THE COURT:  If I agree with you ultimately that you

14   have alleged plausibly a material breach by the Cosmos, do I

15   even need to reach the question of whether that March incident

16   violated the morals clause?

17            MR. COMPO:  Well.

18            THE COURT:  At this stage, on a motion to dismiss.

19            MR. COMPO:  Rule 8 allows us to plead in the

20   alternative and, essentially, the breach of contract fails,

21   then our allegations are under violation of the good faith and

22   fair dealing implied under case law.  Again, same with unjust

23   enrichment.  These are pleadings in the alternative.  And they

24   can be dismissed at some point when the Court determines that

25   there is in fact a contract.  At this point, there's no

FC1LCANC

1    determination of that.  So all the pleadings --

2              THE COURT:  I don't think there's a dispute as to the

3    validity of the contract, is there?

4              MR. COMPO:  Well, the Court hasn't made a

5    determination yet.  I think there's a dispute as to the --

6              THE COURT:  The interpretation of certain provisions,

7    for sure, but I haven't heard that there's a dispute from

8    either side that this was a valid contract.

9              MR. COMPO:  No.

10             THE COURT:  In any event, just why don't you complete

11   your argument.

12             MR. COMPO:  I believe that it's all an integral part

13   of this because this pretext is important because we're looking

14   at the reasonableness of their actions in the total context.

15   So do I believe that there's a breach of contract?  There can

16   also be another substantive claim for breach.

17             THE COURT:  That's not what I was asking.  I was

18   asking if I agree with you that you have plausibly alleged a

19   material breach by the Cosmos, can I deny the motion to dismiss

20   even without reaching the question of whether the March 2014

21   incident violated the morals clause.  That was my question,

22   which is a very different question.

23             MR. COMPO:  I think you have to, your Honor.  I think

24   it's a question of fact.  I think it's not a question of law

25   because under *Nader*, there was an instance that under the

FC1LCANC

1   factual allegations that NBC did not in fact terminate him for

2   an incident.  And then you have the *Mendenhall* case which

3   basically says that yes, there is something that comes out,

4   there is an implied covenant of good faith and fair dealing as

5   it applies to this morals clause.  I think it ultimately is a

6   summary judgment issue or even an issue for the jury.

7           THE COURT:  Okay.  Thank you.

8           Would you like to respond?

9           MR. MIDDLEBROOK:  Briefly, your Honor.  Starting with

10  the question presented last first, the idea that if the Court

11  made a determination that there was a material breach.

12          THE COURT:  That it was plausibly alleged.  I'm not

13  making any determinations, just that one was plausibly alleged.

14  But, yes, please continue.

15          MR. MIDDLEBROOK:  The idea -- there is no damage

16  sustained from this plausible potential breach.  As

17  acknowledged in the complaint, plaintiff has been paid in full

18  up to the termination date.  So even if the Court were to

19  continue, you were to allow the case to continue, there's no

20  damages to be sustained from this alleged breach.

21          So the answer to the question on the law is

22  absolutely.  Under the election of remedies, plaintiff made a

23  clear decision.  And when counsel states was this just going to

24  go on and on.

25          THE COURT:  When do you think -- I asked counsel about

FC1LCANC

1    when that decision was made.  Was it made in the January letter

2    from the French counsel, was it made in the February letter?

3    When was that election made in your view?

4              MR. MIDDLEBROOK:  Every day that Cantona did not

5    terminate the agreement, he elected his remedy.  Every single

6    day he chose to continue his performance under the terms of

7    that agreement and to potentially pursue a claim for breach at

8    a later date, he had to continue his performance in accordance

9    with its terms.  Otherwise, he's not electing a remedy.  He's

10   taking advantage of every potential remedy out there.

11             And the courts have specifically said, the Second

12   Circuit has made abundantly clear, once a party elects to

13   continue the contract, it can never thereafter elect to

14   terminate the contract based on that breach.  That is taken

15   from the *ESPN v. Office of Commissioner* case citing black

16   letter law.

17             This is merely a question of whether or not the

18   termination was appropriate under the morals clause, which it

19   absolutely was, which *Nader* makes abundantly clear.  And it's

20   worth noting, your Honor, this question of does a reasonable

21   opinion require a judicial or an inquiry by a jury, the Cosmos

22   paid over $4 million, potentially, to secure Mr. Cantona as the

23   face of the company.  In doing so, they sought to protect

24   themselves from the potential that Mr. Cantona would conduct

25   himself in a way that damaged the Cosmos.  He did so, and so

FC1LCANC

1    they terminated the agreement, but that is not an issue for a

2    jury.  Otherwise, that renders every potential morals clause

3    meaningless.  If there's a morals clause and it's violated,

4    then we need to get the case to a jury.  It defeats the

5    purpose.  And the case law, the Second Circuit has said these

6    are absolutely acceptable clauses and they are to be given

7    respect within the four corners of these agreements.

8         The specific morals clause at issue in *Nader* said if

9    in the opinion of ABC, artist shall commit any act or do

10   anything which might intend to bring the artist into public

11   disrepute, contempt, scandal, or ridicule, or which may tend to

12   reflect unfavorably on ABC, any sponsor of a program, any such

13   sponsor's advertising agency, any stations broadcasting or

14   scheduled to broadcast a program or any license of ABC, or to

15   injure the success of any use of the series or any program, ABC

16   may upon written notice to artist immediately terminate the

17   term and the artist's appointment.

18        These are by their nature discretionary termination

19   provisions designed to protect the image of the companies

20   entering into these agreements.  The Second Circuit has said it

21   is an issue of law for the court to decide and said

22   specifically there is no reasonable interpretation other than

23   the fact that termination was appropriate where a person gets

24   arrested and they were to be the face of that entity.

25        The idea that discovery is necessary so that it could

FC1LCANC

```
 1    possibly determine what future publications there may have been
 2    does not take the punch out of the face of the paparazzi.
 3    Mr. Cantona acknowledges that he was involved in a physical
 4    altercation with paparazzi.
 5              THE COURT:  It's just argument.  You can wait, okay.
 6              MR. MIDDLEBROOK:  He acknowledges there was an
 7    altercation, that he was cautioned, that there are photographs
 8    taken of him getting into the back of a police car.  The damage
 9    was done the second the story was publicized, particularly
10    publicized referencing Cantona as director of the New York
11    Cosmos.
12              So, you know, again, it was designed to be
13    discretionary.  The Second Circuit has upheld these
14    discretionary provisions.  They were bargained for at arm's
15    length with both parties represented by counsel.  There was a
16    tremendous financial benefit to be gained by Mr. Cantona and
17    his associates in entering into this agreement.  The Cosmos had
18    a right to protect itself and it tried to do so.
19              Now, the idea that every allegation in this complaint
20    must be given the benefit of the doubt and accepted as true is
21    not accurate, your Honor.  The allegations that prompt this
22    inference --
23              THE COURT:  We're making a determination at this
24    stage, at this very early stage of this litigation, as to
25    whether those allegations are plausible under *Iqbal* and
```

FC1LCANC

1   *Twombly*, correct?

2           MR. MIDDLEBROOK:  Correct.

3           THE COURT:  Okay.  Please continue.

4           MR. MIDDLEBROOK:  *Burgess v. Harris Beach PLLC*, 346 F.

5   App'x 658, Second Circuit, where the facts, quote/unquote, as

6   alleged are really designed to cause the court to make various

7   inferences such as pretext where it is a derivative of fact.

8   Those are not entitled to the benefit of an assumption of

9   truthfulness.  They're to be removed from the analysis, and

10  they don't require further factual development when

11  contemplating a motion to dismiss.

12          And that's why when I began speaking your Honor, I

13  made a reference to this idea that there are a significant

14  number of allegations and claims here that truly just cloud the

15  only relevant issue.  The only relevant inquiry is whether or

16  not the termination of Cantona under that morals clause was

17  appropriate and it was, as I've now stated on several

18  occasions.

19          With respect to *Mendenhall*, your Honor, it's fully

20  addressed in the reply papers.  I will only say because it's

21  worth bringing to light, *Mendenhall* did not establish that the

22  implied covenant of good faith and fair dealing was a viable

23  claim.  It was used as a standard of review in evaluating

24  whether the defendant was reasonable in the use of discretion.

25  That inquiry was based on a football player's tweeting

FC1LCANC

1   controversial statements.

2           This has nothing to do with that scenario.  There was

3   an altercation with police involvement, exactly what occurred

4   before the Second Circuit when the termination pursuant to a

5   morals clause was held valid.  So the heavy reliance on

6   *Mendenhall* is misplaced under the facts of this case.

7           THE COURT:  Why don't you just sum up.

8           MR. MIDDLEBROOK:  Your Honor, the morals clause was

9   specifically included in this agreement with Mr. Cantona to

10  protect the New York Cosmos from very particular behavior in

11  light of Mr. Cantona's demonstrated and admitted past, colorful

12  past I believe is what he represented in the complaint.  When

13  Cantona opted not to terminate the agreement and instead to

14  continue performance, he was obligated to perform in accordance

15  with the terms of this agreement.  He did not do so, and he was

16  terminated pursuant to the morals clause.

17          The remaining causes of action, as fully outlined in

18  the briefs, are duplicative and fail as a result and as I've

19  stated previously.  Thank you.

20          THE COURT:  Thank you very much.

21          Mr. Compo, one minute if you'd like it.

22          MR. COMPO:  Yes, Judge.  Under New York law, election

23  of remedies is an affirmative defense.  This is *Lumber Mutual*

24  *Casualty Insurance of New York*, 176 Misc. 703, 28 N.Y.S.2d 506.

25  Furthermore, an election of remedies requires an affirmative

FC1LCANC

action of some kind.  *Hallinan v. Republic Bank and Trust Company*, 519 F.Supp.2d 340 (S.D.N.Y. 2007).  Here, Cantona never communicated expressly or by implication that he would forego the breach.

Good faith attempts to realize contractual benefits while negotiating with a counterparty, rather than immediately filing suit, does not constitute an election of remedies.  This is *Seven-Up Bottling Company v. PepsiCo,* 686 F.Supp. 1015 (S.D.N.Y. 1988).  And the court went on to say a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future.  And they were citing *S.D. Hicks & Son Co. v. J.T. Baker Chem Co.*, 307 F.2d 750 (2d Cir. 1962).

So, again, election of remedies is an affirmative defense.  If Mr. Cantona did not make an election of remedies and there was a material breach of the contract, the question is whether Mr. Cantona had to continue to perform under the agreement, which would bind him to the morals clause.  And if in fact he had to perform under there, was the morals clause reasonable.

So there's a certain trace we have to follow here.  We have to look at the context under which all this happened.  We have to look at the election of remedies issue and whether

FC1LCANC

 1  Mr. Cantona actually chose an election of remedy, and then

 2  whether that morals clause applied to him, and if it did, was

 3  it reasonable.  So there's a set of inquiries we have to go

 4  through here.

 5          THE COURT:  All right.  Thank you very much.

 6          Why don't we adjourn briefly, take a short break, and

 7  then we'll resume.  Thank you.

 8          (Recess)

 9          THE COURT:  I'm ready to rule on the motions.

10          In short, I'm going to deny plaintiffs' motion to

11  strike.  I'm also going to deny defendant's motion to dismiss,

12  except as it relates to plaintiffs' unjust enrichment claims.

13  I don't know whether plaintiff will ultimately be able to prove

14  their claims, but their complaint does allege facts giving rise

15  to a plausible inference that the Cosmos breached their

16  contract with Mr. Cantona.  No more is required of plaintiffs

17  at this time.

18          Why don't I begin with the motion to strike and then

19  I'll move on.

20          First, I'm denying plaintiffs' motion to strike the

21  four news articles describing Mr. Cantona's encounter with a

22  photographer in March of 2014 because it's well established in

23  this district that courts may take judicial notice of news

24  articles for the fact of their publication without converting a

25  motion to dismiss into a motion for summary judgment.  See, for

FC1LCANC

1   example, the *Pension Committee of University of Montreal* case

2   and the *In re Merrill Lynch Research Reports* case.

3           Plaintiffs argue that the Cosmos rely on the articles

4   for their truth, but defendant clearly states that it seeks

5   judicial notice solely for the fact that the articles were

6   published and available online to a global audience.  The

7   Cosmos also correctly notes that whether the articles create

8   any "negative impressions" does not depend on whether or not

9   they are true.

10          I agree and I will not strike the articles, but they

11  will be made part of the record solely as to the fact that they

12  were published and not for the truth of their contents at this

13  stage.  In any event, for the reasons that follow, I need not

14  rely on the articles for the purpose of deciding the Cosmos'

15  motion to dismiss.

16          I'll now turn to that motion.  Let's start with

17  plaintiffs' breach of contract claim.  There's no dispute that

18  Section 11.9 of the consulting agreement provides that it is to

19  be governed by New York law.  The elements of a breach of

20  contract claim under New York law are well established,

21  requiring the formation of a contract, performance by the

22  plaintiff, failure of the defendant to perform, and damages.

23          New York law excuses a party's performance under a

24  contract when a counterparty has substantially failed to

25  perform its side of the bargain or, synonymously, where that

FC1LCANC

party has committed a material breach.  That's a quote from the

*Merrill Lynch v. Allegheny Energy* case from Second Circuit, 500

F.3d at 186.  Whether a party has committed a material breach

is ordinarily a question of fact to be determined after

analyzing a variety of different factors.  See generally the

*Hadden* case from the New York Court of Appeals, 34 N.Y.2d 96.

Here there's at least a factual question as to whether

the Cosmos' failure to pay Mr. Cantona from September 2013

through March 2014 amounts to a material breach of the

agreement that would excuse Mr. Cantona from his contractual

obligations.  If Mr. Cantona was excused from performance, he

was under no obligation to comply with the morals clause in the

agreement for the six-plus months during which he was not paid.

Accordingly, if the Cosmos were in material breach of

the agreement prior to the March 12 incident involving

Mr. Cantona and the paparazzi, the Court need not consider

whether that incident brought anyone into material disrepute

under Section 8.1.3(ii)(D) of the agreement.  Whether

Mr. Cantona violated that or any other section of the agreement

matters only if Mr. Cantona was obligated to perform his

contractual obligations.  Plaintiffs plausibly allege that the

Cosmos' failure to pay Mr. Cantona from September 2013 through

March 2014 constitutes such a breach.

The Cosmos respond that its failure to pay Mr. Cantona

is not a breach as a matter of law because Mr. Cantona elected

FC1LCANC

1    not to terminate the agreement when the Cosmos stopped paying

2    him in September 2013.  This argument improperly conflates a

3    breach of the agreement with its termination.  That Mr. Cantona

4    had not terminated the agreement as of March 12, 2014, only

5    underscores that the Cosmos were under a continuing obligation

6    to pay him as of that date.  In fact, the Cosmos acknowledge in

7    their opening brief that plaintiffs have alleged facts "that

8    would constitute 'good reason'" to terminate the agreement,

9    which essentially concedes that the team failed to perform its

10   contractual obligations.

11         The Cosmos' argument that Mr. Cantona waived or

12   abandoned his ability to terminate the agreement does not alter

13   this conclusion.  Nothing in the agreement suggests that

14   plaintiffs would forego a claim for breach of contract by

15   choosing not to terminate the entire agreement.

16         The Cosmos' reliance on the doctrine of election of

17   remedies also fails at this stage.  The complaint does not

18   allege that Mr. Cantona had decided not to terminate the

19   agreement before March 12, 2014.  Unlike in the *ESPN* case, here

20   there's a factual question in the Court's view as to whether

21   Mr. Cantona elected not to terminate his contract.  Indeed, in

22   the February 14, 2014 letter from Mr. Cantona's French

23   attorney, which is attached to the complaint and incorporated

24   therein, his lawyer noted that the situation was unacceptable

25   and that he may have to consider all necessary actions.  At

FC1LCANC

1   that point, plaintiffs allege that they were not benefiting

2   from the contract in any way.

3         Finally, the Court also disagrees with the Cosmos'

4   argument that Olympica Sports Management and the Joel Cantona

5   Organisation are third party beneficiaries that lack standing

6   to enforce the agreement.  Section 11.2 of the agreement

7   clearly indicates that the parties intended the Cosmos to pay

8   Olympica and Joel Cantona and that they would receive the

9   benefit of Mr. Cantona's performance.  As such, they are

10  "intended beneficiaries" who may enforce a contract under the

11  Restatement (Second) of Contract Section 302, which the New

12  York Court of Appeals adopted in the *Fourth Ocean Putnam Corp.*

13  case, 66 N.Y.2d 44-45.

14        So for these reasons, I'm denying defendant's motion

15  to dismiss plaintiffs' breach of contract claim.

16        I'm also denying the Cosmos' motion to dismiss

17  plaintiffs' claim for breach of the implied covenant of good

18  faith and fair dealing.

19        The implied covenant works only to ensure that a party

20  with whom discretion is vested does not act arbitrarily or

21  irrationally or with bad faith in fact.  That's from the *Dalton*

22  case in the New York Court of Appeals, 87 N.Y.2d 397.

23        Plaintiffs plausibly allege bad faith in fact because

24  they claim the Cosmos' claim of termination for cause was

25  merely a pretext to cancel the agreement.  See paragraph 31 of

FC1LCANC

the complaint.  If the Cosmos sought to terminate the agreement

to avoid having to give Mr. Cantona a 4 percent equity interest

in the team rather than out of a genuine belief that

Mr. Cantona had violated the morals clause of the agreement,

plaintiffs may state a claim for breach of the implied

covenant.  The fact that the Cosmos terminated the agreement

after not paying Mr. Cantona for six-plus months makes

plaintiffs' claim of pretext plausible.

And plaintiffs' implied covenant claim is not

duplicative of their breach of contract claim because it hinges

on the Cosmos' rationale for terminating the agreement, not

whether the March 12, 2014 incident in fact violated the morals

clause.  Plaintiffs' implied covenant claim therefore focuses

on the limits of the Cosmos' discretion in determining whether

Mr. Cantona violated the morals clause.  Plaintiffs plausibly

allege that the Cosmos exceeded those limits.

I'll next turn to Mr. Cantona's claim under Article 6

of New York Labor Law which applies only if Mr. Cantona was an

"employee" of the Cosmos, which hinges on "the degree of

control exercised by the purported employer over the results

produced or the means used to achieve the results."  The *Bynog*

case from the New York Court of Appeals established five

factors for courts to consider when making this determination.

See 1 N.Y.3d 198, although these factors are not exhaustive.

See *Hart v. Rick's Cabaret* case for a list of additional

FC1LCANC

 1   factors, 967 F.Supp.2d 923-24.

 2           Although Section 9 of the agreement disclaims any

 3   employment relationship between Mr. Cantona and the Cosmos, it

 4   is not significant how the parties define the employment

 5   relationship.  That's from *Hart*, 967 F.Supp.2d at 924.  Whether

 6   Mr. Cantona was a Cosmos employee under New York law is

 7   therefore a question of fact that cannot be resolved based only

 8   on the facts alleged in the complaint.  This conclusion is

 9   underscored by the fact that both plaintiffs and defendant

10   point to different sections of the agreement as supporting

11   their analysis of the *Bynog* factors.

12           The Cosmos further argues that even if Mr. Cantona was

13   an employee, his Article 6 claim fails because he served in an

14   exempt executive, managerial, or administrative capacity.

15   That, too, is a question of fact that cannot be resolved on a

16   motion to dismiss.

17           Because plaintiffs plausibly allege Mr. Cantona was an

18   employee of the Cosmos and the facts are not so developed that

19   the Court can determine whether he's exempt, I'm denying

20   defendant's motion to dismiss the Article 6 claim.

21           Lastly, as to plaintiffs' unjust enrichment claims.

22   As a quasi-contractual claim, a cause of action for unjust

23   enrichment can be maintained only in the absence of an express

24   agreement.  That's from the *Beth Israel Medical Center* case,

25   448 F.3d 587.

FC1LCANC

1        Here, the Cosmos do not dispute that the agreement

2   "governs the disputes between the parties in all respects and

3   that it is valid and enforceable."  That's from page 11 of

4   their reply brief.  Since there's no dispute that the agreement

5   is an enforceable contract, I'm granting the Cosmos' motion as

6   it relates to plaintiffs' unjust enrichment claims.

7        So to summarize, I'm denying plaintiffs' motion to

8   strike.  I'm denying defendant's motion to dismiss, except as

9   it relates to the plaintiffs' claims for unjust enrichment.  To

10  avoid any confusion, I am dismissing plaintiffs' third, fifth,

11  and sixth causes of action.  But plaintiffs' first, second, and

12  fourth causes of action may proceed.

13       Of course, it's too early to know whether plaintiffs

14  will be able to satisfy their ultimate burden to prove these

15  claims.

16       So I'm going to thank the court reporter and we can

17  proceed off the record for scheduling and the like.

18       MR. MIDDLEBROOK:  Your Honor, to the extent necessary

19  for the record, the defendant would note its objection to the

20  ruling.

21       THE COURT:  It is so noted.

22                         o0o

23

24

25